IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| ROSTAN SOLUTIONS, LLC., §<br>*Plaintiff*, §<br>§<br>v. §<br>§<br>COMMUNITY CHURCH ASSEMLY OF §<br>GOD CHURCH, d/b/a Community Christian §<br>School, §<br>*Defendant*. § | CIVIL ACTION NO. 1:22-CV-268-MAC-CLS |

**REPORT AND RECOMMENDATION ON DEFENDANT'S
<u>ORAL MOTION TO ENFORCE THE MEDIATED SETTLEMENT AGREEMENT</u>**

Pursuant to 28 U.S.C. § 636 and the Local Rules of Court for the Assignment of Duties to United States Magistrate Judges, the district court referred this proceeding to the undersigned magistrate judge to conduct all pretrial proceedings, to enter findings of fact and recommend disposition on case-dispositive matters, and to determine non-dispositive matters. *See* 28 U.S.C. § 636(b)(1); E.D. TEX. LOC. R. CV-72. Pending before the court is Defendant's oral Motion to Enforce the Mediated Settlement Agreement.

**I.  Background**

Plaintiff Rostan Solutions, LLC ("Rostan") is in the business of "disaster recovery consulting," where it helps organizations apply for and receive funding from the Federal Emergency Management Agency ("FEMA"). (Doc. #1 at 1-2.) After sustaining damages in Hurricane Harvey, Defendant Community Church Assembly of God Church d/b/a Community Christian School ("CCS") entered into a contract with Rostan on or around April 2, 2018, to go through the FEMA grant application process. (*Id.*) At some point, the relationship between the parties fell apart and on June 28, 2023, Rostan filed this diversity suit against CCS alleging breach of contract. (Doc. #1.)

Rostan seeks payment of $310,404.48 in unpaid invoices and an additional 4% monthly finance charge. (*Id.* at 3.) CCS asserts several legal and equitable defenses. (Doc. #4 at 3.) On April 20, 2023, the parties engaged in their second mediation. (Doc. #21 at 2.) That afternoon, the mediator emailed the parties to congratulate them on reaching a settlement and outlined the key terms of the agreement. (Doc. #21-1.) The mediator requested both parties confirm their agreement to the proposal by responding "agreed" to the email. (*Id.*) Both parties did so. To date, however, the parties have not been able to formalize their agreement.

On August 18, 2023, the court referred this case to the undersigned for pretrial management. (Doc. #17.) At a status hearing on August 29, 2023, CCS orally moved to enforce the mediated settlement agreement. (Doc. #18.) CCS filed a brief in support of their oral motion on November 9, 2023, arguing that the mediated settlement agreement ("MSA") included all material terms and meets the requirements of Texas Rule of Civil Procedure 11.[1] (Doc. #21.) In its brief opposing the oral motion, Rostan argues that the MSA is merely an agreement to agree, because it is ambiguous and is missing a material term.[2] (Doc. #22.) This matter is now ripe for review.

## II.  Legal Standard

Rule 11 of the Texas Rules of Civil Procedure states that, "[u]nless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made

---

[1] Despite its place in the Texas Rules of Civil Procedure, Rule 11 is considered substantive for *Erie* purposes. *Oliver St. Dermatology, LLC v. Creger*, No. 1:17-CV-528-LY, 2018 WL 2452975, at *2 (W.D. Tex. May 30, 2018); *see Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256 (5th Cir. 1995) (applying Rule 11 to determine if parties had a settlement agreement in a diversity suit).

[2] Plaintiff also argues that evidence from the mediation is admissible to (1) provide context to the terms in the agreement, and (2) to help address their alternative claim for fraudulent inducement. (Doc. #22 at 1, 15-16.) The parties may have waived the privilege, in part, by consenting to unsealing Plaintiff's briefing. However, as explained below, the court need not reach that issue.

in open court and entered of record." TEX. R. CIV. P. 11. Once parties enter into a valid settlement agreement under Rule 11, the trial court may render an agreed judgment based on the settlement agreement. *Juarez v. Laredo Inv. Properties, Inc.*, 04–10–00821–CV, 2011 WL 4377999, at *3 (Tex. App.—San Antonio Sept. 21, 2011, no pet.) (citing *Mantas v. Fifth Ct. of Appeals*, 925 S.W.2d 656, 658 (Tex. 1996); *Padilla v. LaFrance*, 907 S.W.2d 454, 461–62 (Tex. 1995)). When a party withdraws its consent to a settlement agreement before judgment is rendered, however, the trial court may not render an agreed judgment on the settlement agreement. *Padilla*, 907 S.W.2d at 461. Rather, the court must enforce the settlement agreement as a written contract, but only after the party seeking enforcement pursues a breach-of-contract claim, following the normal rules of pleading and proof. *Mantas*, 925 S.W.2d at 658. Otherwise, a party would be deprived of the right to be confronted by appropriate pleadings, assert defenses, conduct discovery, and submit contested fact issues to a judge or jury. *See Cadle Co. v. Castle*, 913 S.W.2d 627, 632 (Tex. App.—Dallas 1995, *writ denied*).

The enforcement of a written settlement agreement is governed by principles of contract law. TEX. CIV. PRAC. & REM. CODE ANN. § 154.071(a) (West 2011); *Martin v. Black*, 909 S.W.2d 192, 195 (Tex. App.—Houston [14th Dist.] 1995, *writ denied*); *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 255–56 (Tex. App.—Austin 2002). When construing a written contract, the first priority is to give effect to the intent of the parties as expressed in the instrument. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). A court considers the entire writing in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *J.M. Davidson, Inc.*, 128 S.W.3d at 229. Neither will any single provision control the interpretation. *Id.* Instead, all provisions will be considered in reference to the whole. *Id.*

**III.   Discussion**

For clarity, the undersigned will provide a simplified overview of FEMA grant funding and Rostan's business model.[3] Rostan helps entities navigate the FEMA grant application process for a fee. (Doc. #1 at 2.) Aware of such costs, the U.S. government provides FEMA grant receivers, like CCS, with funding for direct administrative costs, or "DAC," to pay the costs it incurs for employing disaster consulting firms like Rostan. (Doc. #22 at 2.) FEMA determines how much DAC is merited, in part, based on a complex accounting of the consulting firm's billables and other records. (*Id.*) A disaster consulting firm is generally better equipped to navigate this process and will do so on their client's behalf. After reviewing the record for administrative costs, FEMA "obligates" DAC for a grant recipient. (*Id.*) To access that obligated DAC funding, the grant recipient can either: (1) apply for advanced DAC funding to pay an initial portion of their bills to the consulting firm, or (2) pay their consulting firm up front and get reimbursed with the obligated DAC funds set aside by FEMA. (Doc. #29 at 65.)

The entirety of the MSA in question is the following five terms:

1. Rostan Solutions will receive 100% of DAC funds received from FEMA;

2. The parties agree to fully cooperate with each other to permit Rostan access to the FEMA and TDEM portals;

3. Church will designate a representative to coordinate with Rostan in the effort to collect additional DAC funds. Church will use its best efforts to respond to questions or emails within 48 hours;

4. In cooperation with Community Church, Rostan will be the lead facilitator in communication with TDEM and FEMA regarding the DAC reimbursement;

5. Community Church will pay the following sums in consideration for a full release and dismissal of all claims:

---

[3] Under Texas law, a court may consider extrinsic evidence to understand technical terms. *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 486 (Tex. App.—Fort Worth 2020). For that purpose, the undersigned looks to testimony from the evidentiary hearing on November 16, 2023, (doc. #27), but does not consider potentially privileged information from the mediation.

> — $50,000 within 7 days of execution of Release;
> — $25,000 180 days later;
> — $25,000 180 days after the $25,000 payment.

(Doc. #22-1.) CCS contends that the MSA meets the requirements of Rule 11 and the court should enter an agreed judgment based on the MSA. Rostan contends the MSA is ambiguous and is missing key terms. Without the consent of Rostan, the court cannot enter an agreed judgement. *Padilla v. LaFrance*, 907 S.W.2d 454, 461–62 (Tex. 1995). Accordingly, the court must determine if the parties consented to a valid contract when they agreed to the mediator's proposal via email on April 20, 2023. The undersigned will address each contention in turn.

    A. <u>Ambiguity</u>

Rostan argues the first term in the agreement is ambiguous. During the evidentiary hearing, the parties disagreed about the meaning of term one of the MSA: "Rostan Solutions will receive 100% of DAC funds received from FEMA." CCS argued that term one meant that Rostan would receive all DAC funds "once it was awarded from FEMA." (Doc. #29 at 26.) That would occur, according to CCS, "once the paperwork was filed by Rostan." (*Id.*) Rostan argued that, as written, term one of the MSA only entitled it to funds received by CCS from FEMA, which requires CCS to pay DAC up front or apply for advanced funding—actions not required in the agreement. (*Id.* at 61.) When the undersigned questioned CCS if they could simply sit idle and not take any steps to *receive* obligated DAC from FEMA, CCS did not offer a direct response answering that Rostan would have an "equitable interest" in whatever DAC funds are obligated. (*Id.* at 62.)

"A contract is not ambiguous merely because the parties disagree about its meaning and may be ambiguous even though the parties agree it is not." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." *Heritage Res., Inc. v. NationsBank*, 939

5

S.W.2d 118, 121 (Tex. 1996). While a court may look at extrinsic evidence to understand the contract's meaning, it may not substitute any ambiguous term for "what the parties subjectively wished or hoped the contract said." *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 484 (Tex. App.—Fort Worth 2020). After looking at extrinsic evidence, such as explanation of technical language, "a latent ambiguity [may become] apparent in the term." *Id*. at 488.

Here, the first term of the MSA is not susceptible to multiple interpretations. CCS is the only party that can receive DAC funds directly from FEMA. The only meaning of "DAC funds *received* from FEMA" is the DAC funds FEMA actually pays to CCS after all necessary steps are taken. Likewise, enforcing term one does not reveal any latent ambiguities. CCS has three courses of action: (1) apply for and *receive* advanced DAC funding, (2) pay Rostan the DAC and *receive* FEMA DAC funds as reimbursement, and (3) sit idle after DAC funds are obligated and *receive* no DAC funds. In each scenario, it is clear that if funds are *received* by CCS from FEMA, Rostan would be entitled to those funds.

This does create some interesting situations. Taken literally, if CCS pays Rostan its DAC and then *receives* reimbursement funds from FEMA, could Rostan seemingly claim that reimbursement as well since it is "DAC funds *received*?" If CCS sat idle and did not pay Rostan or apply for advanced funding, then no DAC would be *received*, and Rostan would be entitled to no compensation beyond the $100,000 specified in term five of the MSA. This seems to cut against the meaning of the MSA, but that does not make the term itself ambiguous. As the first term has a clear meaning in all scenarios, the undersigned finds this term to be unambiguous.

B. Material Terms

Materials terms of a contract are those that allow a court "to determine the respective legal obligations of the parties." *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 455 (Tex. 2009); *see also*

*McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (finding a settlement agreement had all material terms where "[i]f a court was trying to enforce the settlement agreement, it could find all the terms necessary for its enforcement"). To be enforceable, a contract must contain all material terms and give meaning to each part of the contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (citing *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966); *Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App.—San Antonio 1989) (noting that "a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook"); *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (observing that all provisions in a contract must be interpreted "so that none will be rendered meaningless"). In other words, if a court cannot enforce a contract in a way that gives meaning to all the terms, there was no meeting of the minds, and the contract is unenforceable.

Reading the MSA as a whole, the undersigned finds there is a material term missing from the MSA that connects the *receipt* of DAC funds in term one and the cooperation of CCS set out in terms two, three, and four. To explain this finding, the undersigned will outline the two potential ways a court could enforce the MSA and explain why neither version gives meaning to all provisions in the contract.

First, a court may hold term one of the agreement to its plain meaning as "DAC funds received" as those paid by FEMA to CCS. As explained in the testimony, terms two, three, and four of the MSA outline how Rostan and CCS will work together to *obligate* the appropriate amount of DAC from FEMA. (Doc. #29 at 19-20.) CCS testified that under the terms of the MSA it would have to allow Rostan access to the portal and help with paperwork. (*Id.* at 29.) This cooperation to *obligate* DAC, however, is not the same as cooperation to ensure that DAC funds are ultimately *received*. If CCS applied for and *receive*d advanced funding, or paid Rostan and

7

*received* DAC funds as reimbursement, then Rostan would be entitled to that money. If CCS did nothing beyond allowing access to the portal or executing paperwork at the *obligation* stage, Rostan would receive no DAC funds and have no recourse under the agreement, rendering term one of the agreement meaningless. The court, however, must interpret all contract provisions together to give meaning to each. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).

Alternatively, a court could enforce the agreement by requiring CCS to take affirmative steps to *receive* the DAC funds such that they could be paid to Rostan. While this version of MSA enforcement gives meaning to all provisions in the contract, it requires a court to rewrite an unambiguous term, which is impermissible under Texas law. *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 484 (Tex. App.—Fort Worth 2020). The undersigned, therefore, finds no way to enforce the MSA in a way that gives appropriate meaning to all the provisions.

While a party's subjective view of the MSA cannot replace the words memorialized in the agreement, the undersigned finds that the parties' testimony at the evidentiary hearing echoes her concerns about enforceability. The undersigned repeatedly asked CCS what its obligations were under the MSA or how it could be enforced. Pointing to terms two, three, and four of the MSA, CCS claimed they were bound to cooperate with Rostan to get DAC funds *obligated*, over which Rostan would have "100 percent equitable ownership." (Doc. #29 at 62.) CCS could not explain what, if any, obligation it had to ensure that money was *received* for the purpose of paying Rostan and no provision of the agreement requires them to act to get funds *received*. As Rostan correctly notes, the MSA only references "DAC funds received," meaning Rostan could *receive* nothing if

8

CCS failed to act.[4]  (*Id.* at 71.)  This suggests to the undersigned that there was no meeting of the minds, and that some material term making term one enforceable is missing.

## IV. Conclusion

The Mediated Settlement Agreement, as written, provides the undersigned with no way to enforce the contract without rewriting term one or finding it meaningless.  Accordingly, the undersigned finds the MSA lacks a material term and is, therefore, unenforceable.

## V. Recommendation

The oral motion to enforce the mediated settlement agreement should be **DENIED**.

## VI. Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).  To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Without leave of court, objections are limited to eight (8) pages. E.D. TEX. LOC. R. CV-72(c).

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Services Auto. Ass'n*,

---

[4] Term three of the MSA states CCS must "designate a representative to coordinate with Rostan in effort to collect additional DAC."  The MSA does not state what constitutes "additional DAC" or what it means to "collect" those additional funds.  The evidentiary testimony, however, made clear that while the parties must work together to *obligate* the appropriate amount of DAC, only CCS can turn *obligated* DAC into *received* DAC.

79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*; 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this the 5th day of February, 2024.**

_____
Christine L Stetson
UNITED STATES MAGISTRATE JUDGE